STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-462

THE CADLE COMPANY II INC.

VERSUS

RESERVES MANAGEMENT LC AND DESTIN RESOURCES

************
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, DOCKET NO. 202110868
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE
************
**LEDRICKA J. THIERRY**
**JUDGE**
************

Court composed of Elizabeth A. Pickett, Jonathan W. Perry, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

Mark C. Landry
Newman, Mathis, Brady & Spedale, APLC
3501 N. Causeway Blvd., Suite 300
Metairie, LA  70002
(504) 837-9040
COUNSEL FOR APPELLANT:
        The Cadle Company II, Inc.

Tom St. Germain
Weinstein & St. Germain, LLC
1103 West University Ave.
Lafayette, LA  70506
(337) 235-4001
COUNSEL FOR APPELLEE:
        Thrall Texas Oil, LLC

**THIERRY, Judge.**

This appeal involves the trial court's grant of a preliminary injunction in favor of appellee, Thrall Texas Oil, LLC (hereafter Thrall), that would prevent Appellant, the Cadle Company II, Inc. (hereafter Cadle), from going forward with a sheriff's sale of pipe, tubing, and a Christmas tree located at the Melba Billeaud #1 wellsite located in Acadia Parish. Cadle has timely appealed the trial court's grant of the preliminary injunction. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

Both Thrall and Cadle assert they are the rightful owners of the movable property at issue in this appeal. The record establishes in 2014, Basin Louisiana, LLC (hereafter Basin), entered into mineral leases with various landowners for drilling and extraction of oil and gas from the property located in and around the subject property. On March 30, 2016, the mineral leases were assigned by Basin fifty percent each to Reserves Management, LC (hereafter Reserves) and Destin Resources, LLC (hereafter Destin).

On April 12, 2016, Linder Oil Company (hereafter Linder) entered into a surface lease (hereafter the Linder Surface Lease) for the wellsite with Gerard Romero and his family for 3.5 acres of land, located in Acadia Parish in and around the location of the Melba Billeaud #1 well. Linder was a partnership which had operated oil and gas wells owned by Destin and Reserves. Linder, as operator, drilled the Melba Billeaud # 1 in April of 2016. It ultimately produced very little oil or gas for Linder, was deemed a non-producing well, and all activity was halted at the site.

On April 22, 2016, Reserves and Destin executed a promissory note in favor of First NBC Bank, which included a security agreement which encumbered numerous mineral leases which included the 2014 Basin mineral leases. This

1

security agreement included a security interest in the "operating equipment" used in connection with the leases. An accompanying UCC-1 financing statement was filed with the mortgage on that date. Neither document included a legal description of the Linder Surface Lease, but only recordation information for the various mineral leases on the property.

By February of 2017, several oil well liens were filed against the Melba Billeaud #1 wellsite, all of which were for unpaid equipment and services provided to the wellsite, which was purported to total over $800,000.00. Linder, Destin or Reserves never paid for these items. The liens eventually were assigned to Thrall.

On October 10, 2017, Linder filed for bankruptcy. Reserves and Destin also filed for bankruptcy. The FDIC, acting as receiver, assigned the notes and mortgages executed by Linder, Destin and Reserves, which were held by First NBC Bank, to Cadle. It is contended by Cadle that as part of its collateral package, it had mortgages on all oil and gas leases owned by Destin and Reserves, which included the grant of a security interest in all movables that Destin and Reserves owned that were related to these oil and gas leases.

On May 16, 2019, in the proceedings on the Linder bankruptcy, the lessors of the Melba Billeaud wellsite sought a declaration that the Linder Surface Lease between the lessors and Linder be deemed rejected. On September 11, 2019, the bankruptcy court signed an order determining that the Linder Surface Lease was deemed rejected, but the court also ruled Cadle "reserves its collateral rights in any and all movable or immovable property which may be present on the Land." According to Thrall, once the Linder Surface Lease was rejected, any equipment remaining on the surface or in the ground, such as the piping and tubing, were abandoned and thus became the property of the landowners.

The Melba Billeaud #1 wellsite was placed into the Louisiana Orphan Well program by the State of Louisiana on April 20, 2018. Thrall became the operator of the Melba Billeaud #1 wellsite and began the process to acquire and remove the wellsite from the orphan well program. To this end, it entered into a Cooperative Agreement with the State of Louisiana on April 8, 2020. Thrall proceeded to add production equipment, installed a sales line, and began production in June of 2020. Thrall was able to use the existing piping and tubing that had already been placed at the wellsite. Thrall then executed a cash sale with the landowners transferring any ownership they had in the movable property located at the wellsite to Thrall.

On November 17, 2021, Cadle filed an executory proceeding to foreclose on certain property located at the Melba Billeaud #1 wellsite in Acadia Parish. Named as defendants in the executory proceeding were Reserves and Destin, based on the promissory note Cadle held that it maintained was defaulted by Reserves and Destin. On November 18, 2021, the trial court issued a writ of seizure and sale to the Sheriff of Acadia Parish, instructing a seizure and sale of the property set out in the security agreement.

On February 4, 2022, Thrall filed a "Petition for Intervention to Arrest Foreclosure, for Injunction and for Damages." The petition for intervention requested the trial court "issue an order to stop the sheriff's sale of pipe, tubing, casing and other items located at the Melba Billeaud #1 gas well." Thrall's petition for intervention maintained "these items are not owned by [Destin and Reserves], or Cadle, nor are they subject to Cadle's mortgage." The petition also sought damages if Cadle was successful in seizing the equipment.

Initially, Cadle filed an Exception of No Cause of Action, asserting Thrall had not claimed any ownership interest in the property that Cadle was seeking to seize. Cadle also filed an Exception of Improper Cumulation of Actions, contending in an

executory proceeding, a damage claim could not be cumulated with an injunction petition that sought to enjoin the execution of a writ of seizure and sale. The trial court granted the exception of no cause of action, but allowed Thrall thirty days to amend the petition to state a cause of action. On March 7, 2022, Thrall filed an amended petition asserting a claim of ownership and deleting the claim for damages.

The trial court held another hearing on the request for a preliminary injunction on March 14, 2022. Both Thrall and Cadle presented testimony and documentary evidence at the hearing. Thrall noted that although counsel for Cadle stated it was only interested in seizing the pipe, tubing and Christmas tree, its Petition and the Notice of Seizure contained a much broader property description. At the end of the hearing, the trial court granted the preliminary injunction preventing Cadle from instructing the sheriff to seize and sell any of the items at the wellsite. The trial court gave the following oral reasons for its ruling at the conclusion of the hearing:

> COURT: Obviously, no permanent – I mean, I am not – I am not confident in ruling on a permanent injunction here, without further review of the law and the exhibits that are before the Court.
>
> MR. ST. GERMAIN (Counsel for Thrall): Right.
>
> MR. LANDRY (Counsel for Cadle): Judge, I was –
>
> COURT: Which I would need more briefing on.
>
> MR. LANDRY: I would like the opportunity to brief the issue of why a preliminary injunction should not issue because, trust me, Judge, this is not the first one I have done. And there is a question –
>
> COURT: But if you're telling me that your – okay. Its just the reverse. If you're telling me that your client is not ready to push for the sale, then what is the harm of granting the preliminary injunction to make sure that there is something – something in writing, saying, "Everybody, wait. We need to figure this out before there is any further action on this" – not well, but –
>
> MR. ST. GERMAIN: Equipment.
>
> COURT: -- equipment – thank you; equipment attached to the well.

4

MR. LANDRY:  If I may –

COURT:  So you know –

MR. LANDRY:  If I may, in order to demonstrate the entitlement to a preliminary injunction, there has to be demonstrated irreparable injury. And until such time as irreparable injury is demonstrated, the Court cannot issue a preliminary injunction.  The permanent injunction is teed up and we can try that.

However, I could, with the mere swipe of a pen, create irreparable injury by instructing the sheriff to seize.  What I am telling you is there is currently no irreparable injury, because I have not done that.

And I would like the opportunity to address a brief to the Court to demonstrate that that's why it is not.  And I will warrant to the Court that I will not take action to enforce the writ until such time as I have had the opportunity to brief it and Your Honor has the opportunity to decide.

COURT:  I think what would be appropriate is a court order agreed upon by – like a consent judgment ordering that the sale is ceased until the permanent injunction can be tried, which is the preliminary injunction.

MR. LANDRY:  But there is no sale set.

MR. ST. GERMAIN:  Your Honor, I don't think he's going to agree on a preliminary injunction.  If the Court could just issue the order, that would – I think that would be helpful and we can move forward.

COURT:  I think the best security at this particular point – when this preliminary injunction, when this application or petition for preliminary injunction had filed, there was a sale set.

MR. LANDRY:  No.  There was not.

COURT:  We had an emergency hearing in Lafayette.

MR. ST. GERMAIN:  We had – we had a –

MR. LANDRY:  There was no –

MR. ST. GERMAIN:  We had a date.  And I called the Sheriff's Office. They said the sale was set.  Mr. Landry indicated – before or after – I think it was after –

COURT:  Wait, y'all had a gentleman's agreement.  But that – we go back to this every single time.  A gentleman's agreement does not cut it for me.

5

MR. LANDRY:  Judge, if I may, in order for a sheriff's sale to be scheduled, items must be seized.  He can tell you, I have not seized anything.  Therefore, as a matter of law, no sale can be set until, one, the items are seized and a notice of seizure is properly served.

Okay, so there was never a sale date.  And I don't know how many times I can say that.  I would love to call a witness from the Acadia Parish Sheriff's Office and put that person on the stand and have her say we couldn't go to sale.  We may have put it on a computer, but that's not it.

COURT:  Where did the description of the sale come from?

MR. ST. GERMAIN:  The Sheriff's Department, but –

MR. LANDRY:  The sheriff's website, which is not a public record in any way, shape, or form.  Okay.  That's – I mean, if I was objecting to him as testifying to hearsay.

COURT:  Well, there was executory process done, right?  There was executory process that was completed.  And at that stage, the Court ordered seizure and sale.

MR. ST. GERMAIN:  Yes.

COURT:  Okay.

MR. LANDRY:  But the sheriff had not accomplished it.

COURT:  But the sheriff can.

MR. ST. GERMAIN:  Yes.

COURT:  I mean, it's an order telling them.   There's an order telling them to go seize and sell.  But there's no order telling them, "Hang on. We got to figure this out."

So I think in the interest of justice, to make sure it's absolutely crystal clear, until ownership of the equipment can be established, that a preliminary injunction does need to be ordered so that the sheriff is crystal clear that the executory process order, he needs to hang on, because we got to figure some stuff out.

Because if he seizes and however he does it, with his operator agreement or his without a permit, with a permit, whatever, it's – it can cause irreparable damage to Thrall as well as to – I mean, we heard testimony of possible environmental damage as well.

So with that being said, I'm going to issue the preliminary injunction at this point.

Cadle filed a motion for devolutive appeal, which was granted on March 28, 2022. On appeal, Cadle contends the trial court improperly granted the Motion for Preliminary Injunction.

## ANALYSIS

"An appeal may be taken as a matter of right from an order or judgment relating to a preliminary or final injunction." La.Code Civ.P. art. 3612(B). judgment. In *Deshotels Plantation, LLC v. Torrent Gulf Coast, LLC*, 19-750, p. 3 (La.App. 3 Cir. 4/22/20), 297 So.3d 1034, 1038-39, this court discussed the standard of review applicable to preliminary injunctions:

> A trial court has broad discretion in its decision to grant or deny a preliminary injunction and that decision will not be disturbed on review absent an abuse of that discretion. *Yokum v. Pat O'Brien's Bar, Inc.*, 12-217 (La.App. 4 Cir. 8/15/12), 99 So.3d 74. "That broad standard is, of course, based upon a conclusion that the trial court committed no error of law and was not manifestly erroneous or clearly wrong in making a factual finding that was necessary to the proper exercise of its discretion." *Id*. at 80. When errors of law are involved in the granting of a preliminary injunction, a de novo standard of review is applied. *Meredith v. I Am Music, LLC*, 18-659 (La.App. 4 Cir. 2/13/19), 265 So.3d 1143.

Having found no error of law, the applicable standard of review here is whether the trial court committed manifest error.

Cadle's lone assignment of error asserts the trial court erred in granting the preliminary injunction without making a determination that Thrall presented evidence demonstrating it was likely to succeed on the merits. The trial court's oral reasons for granting the preliminary injunction reveal the trial court determined that it needed more evidence regarding the ownership of the property in question, and therefore granted a preliminary injunction to prevent the property from being seized. Cadle argues this was error because "Thrall came forward with no evidence as to their claim that Destin and Reserves did not own the property."

7

Initially, we note the trial court's granting of the preliminary injunction gives Thrall no more relief than what counsel for Cadle repeatedly stated he was offering. Specifically, as set forth above, counsel for Cadle affirmatively stated he would "warrant to the Court" that no attempt to enforce the writ of seizure would be taken until the trial court had "the opportunity to decide" the issue of ownership. The trial court noted this "gentleman's agreement" between the parties, but stated such a non-binding, gentleman's agreement did "not cut it" for the court. The trial court reasoned what "would be appropriate is a court order . . . ordering that the sale is ceased until the permanent injunction can be tried, which is the preliminary injunction." As the granting of the preliminary injunction effectively provides no greater relief than counsel for Cadle attested he was offering, we find no error in the trial court granting the preliminary injunction.

Cadle also argued below that "in order to demonstrate the entitlement to a preliminary injunction, there has to be demonstrated irreparable injury. And until such time as irreparable injury is demonstrated, the Court cannot issue a preliminary injunction." We find the evidence in the record establishes if the court would allow Cadle to seize and sell the pipe, tubing, and Christmas tree, that irreparable injury would be demonstrated. The evidence was clear that at the time of trial, Thrall, as the operator, was producing gas and a minor amount of oil from the wellsite. Mark Barton, a petroleum engineer for Thrall, offered uncontradicted testimony that Thrall was producing "about 400,000 cubic feet (of gas) and seven barrels of oil a day." Mr. Barton noted you "would have to plug [the] well properly to be able to pull the tubulars." He further testified if the equipment were to be removed "without the proper procedures . . . Thrall could be terribly damaged." He noted that pulling the tubulars would necessarily "involve shutting down the well and therefore royalty interest owners would lose their income. The State of Louisiana would lose tax

8

revenue from this well, and Thrall would lose revenue as well." The trial court also noted in its oral reasoning for granting the preliminary injunction that the seizure "can cause irreparable damage to Thrall as well as to – I mean, we heard testimony of possible environmental damage as well." Thus, we find Thrall made a showing of irreparable injury which the trial court noted in its granting of the preliminary injunction.

## DECREE

For the foregoing reasons, we affirm the trial court's granting of Thrall's request for a preliminary injunction. All costs of this appeal are assessed to appellant, the Cadle Company, II, Inc.

**AFFIRMED.**